IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

DAVID R. NORMAN,            )
                            )
       Plaintiff,           )   Case No. 04-1545-KI
                            )
vs.                         )   OPINION AND ORDER
                            )
BLUE HERON PAPER COMPANY, an )
Oregon corporation; and ERIC JENSEN, )
                            )
       Defendant.           )

      F. Gordon Allen
      McEwen Gisvold LLP
      1100 S. W. Sixth Avenue, Suite 1600
      Portland, Oregon  97204

          Attorney for Plaintiff

      Maryann Yelnosky
      Karen O'Connor
      Barran Liebman LLP
      601 S. W. Second Avenue, Suite 2300
      Portland, Oregon  97204-3159

          Attorneys for Defendant

Page 1 - OPINION AND ORDER

KING, Judge:

Defendant Blue Heron Paper Company ("Blue Heron") terminated plaintiff David Norman from his job. Blue Heron claims that it did so after Norman had a physical altercation with a co-worker. Norman denies that he touched the co-worker and believes that he was terminated because of age discrimination and workers' compensation discrimination. Before the court is Defendant's Motion for Summary Judgment (#40). For the reasons below, I grant summary judgment and dismiss the workers' compensation discrimination claim, leaving the age discrimination claims for trial.

**FACTS**

Blue Heron filed a motion to strike much of the evidence submitted by Norman. I decline to rule on the objections to statements made in Plaintiff's Response to Defendant's Concise Statement of Material Facts. The court uses these statements as a roadmap to the evidence and does not view the statements as evidence itself, unless facts are expressly admitted.

Blue Heron objected that many statements were inadmissible opinion evidence without a proper foundation. For example, Scott Belisle stated in his declaration that he worked for Norman for five years and found him to be fair to workers and always there to help. This is not an inadmissible opinion; it is the declarant's perception of Norman's demeanor based on their joint work experience. In general, I deny this type of objection.

I decline to rule on the remaining objections because the evidence is not necessary for my analysis.

Blue Heron Paper Company operates a paper mill in Oregon City, Oregon. Blue Heron's employees and a venture capitalist purchased the mill from Smurfit Newsprint Corporation

("Smurfit") in May 2000. David Norman was hired at the mill in 1993 as the Pulp and Paper Superintendent and then moved to be Paper Machine Superintendent in charge of the mill's three paper machines. At the time of the incident, Mike Siebers was Mill Manager, Eric Jensen was Operations Manager, and Rod Doubleday was Human Resources Manager.

Some employees reported situations with Norman during which he acted inappropriately, such as displaying a temper or rudely yelling at them. These employees include Ron Mellott, Dorena Oswald, Marcia Pope, Eric Christiansen, Jerry Stanley, Janet Malloc, and Ray Andrews. Siebers tried to coach Norman over the years on his interaction style. Norman denies that he acted inappropriately with the employees or that he was coached about it. Many Blue Heron employees and former employees state that Norman was a good manager, was tough but fair, was very safety conscious, was willing to get dirty working on the paper machines if necessary, and might raise his voice due to the noisy environment but did not get out of control or become threatening.

At some point, Jensen asked Norman how long he was going to work. Norman replied that he would be around there for a long time. Norman states that his area of responsibility was being thrust towards a younger group of people, with older employees being replaced by younger employees. This activity slowed down when the company became Blue Heron. Norman also states that the older supervisors got additional work without additional compensation. Norman was asked to formulate a succession plan so that a younger employee could be groomed to take his place. In 1995, 1999, and 2000, Siebers told Norman that he wanted to hire younger engineers into jobs Norman had open at the time. After one such statement in a conversation in which Doubleday was present, Doubleday came to Norman later and said that Siebers should not

have said "younger" and that Doubleday had so instructed him.  Norman and Jensen had lots of disagreements over how Norman should fill job openings.  Norman wanted to hire people from within the company and Jensen wanted to hire engineers from outside the company who, in Norman's opinion, tended to be younger.  Jensen also reminded Norman that Siebers wanted to hire younger engineers.

At some point after Norman injured his shoulder in March 2005 and before Norman's termination, Jensen saw Norman struggling to raise his arm up on his desk.  Jensen asked if Norman hurt his shoulder.  When Norman said that he did, Jensen said that he must have hurt it working on his car.  Norman said, "[B]aloney, I hurt it on No. 3 paper machine – or you know I hurt it on No. 3."  Norman Depo. at 178.  Jensen claims he told Norman that he should fill out an accident report.  Norman stated, "[T]here's no way, [I] will never report that accident, it will not become a work accident."  Jensen Depo. at 32.  Norman denies that there was any discussion about the accident report.  Norman believes that Jensen should have filled out the accident report because he was Norman's supervisor and Norman reported the accident to him.

Norman recalls a conversation with either Jensen or Doubleday during which he was told that a claim costs the same regardless of what pocket it comes out of.  Norman interpreted this remark as intended to discourage him from filing a workers' compensation claim because the rates are raised based on the number of claims.

John Blakley, a nineteen-year-old pulp utility employee who had worked at the mill less than 90 days, reported to Paper Machine No. 1 on June 5, 2004 to assist in a wire change.  A wire on a paper machine is an expensive cylindrical piece of fabric wrapped around several large

rollers that is used in the process of dehydrating wet pulp. During the change, a bolt fell onto the new wire, making it unfit for use. The crew rolled up the new wire and got a second one.

While this was all occurring, Norman had a few brief conversations with Blakley. Blakley called Norman "sir" three times, even after Norman instructed Blakley to just call him by his first name, Dave. On the third time, Norman told Blakley to get his locks[1] and return to his regular job. Norman admits raising his voice during this last exchange. Norman believed that Blakley thought calling him "sir" was humorous to the point that Norman thought Blakley actually laughed at him the third time. Norman denies touching Blakley. Other employees at the incident, including Gary Furlow and Cary Clancy, heard raised voices but did not witness any violence. Some, including Furlow, were not sure that they witnessed the entire event.

Blakely reported the incident with Norman to Blakley's supervisor, Mellott, and gave Mellott a written description of the incident:

> I was called to paper machine #1 at 7:00 am by Mike Hellberg.
> When my trainee and I arrived at paper machine #1 I locked out tagged out, with my locks,
> My trainee didn't have his locks but was still asked to lockout the machine, I asked Dave Norman [i]f he could use my locks in place of his locks. He said no and told me that he had to get how own locks
> I said "alright sir", he told me to not call him sir, I apoligized.
> Ten minutes passed as the paper machine workers my trainee and I prepared the machine for the new wire to put placed on the machine, cleaning, rolling out the new wire. The first wire unrolled to replace the old wire was damaged during the unrolling. So my relief and I rolled the newly damaged wire up.
> As the other workers and I prepared to unroll a new wire Dave Norman started to yell at me

---

[1] For safety reasons, Blue Heron employees are all issued a set of personalized locks that enable each employee working on a machine to lock the circuit breaker open so that the machine has no power. The circuit breaker cannot be closed, and the machine cannot be operated, until all locks have been removed.

> Telling me to get on the other side of the wire, he kept shouting at me until I got to the other [s]ide, I couldn't believe how loud he was shouting at me and it made me nervous, he then [s]eparated me from the other workers by grabbing me by the arms, he told me to "wipe that [s]mile off my face"! I was embarrassed and couldn't help from laughing. I apologized and said
> "I sorry sir". He then said "get your locks and radio and get out".

O'Connor Decl. Ex. 2 at BH14 (some corrections made to improve readability).

Mellott gave Blakley's description to Jensen, who informed Doubleday and Siebers. Jensen began an investigation. Doubleday and Jensen interviewed Blakley, who confirmed the written description, including Norman grabbing him. Jensen asked Blakley about whether and why he had been smiling. Blakley told Jensen that it was a nervous response. Jensen was aware of the fact that Blakley was young and inexperienced.

Doubleday and Jensen interviewed Jim Thorne, who corroborated Blakley's description. Thorne stated that he saw Norman grab Blakley by the shoulders and shove him off to the side.

On June 8, 2005, Jensen and Doubleday met with Norman, who corroborated much of the information provided by Blakley and Thorne. Norman denied having any physical contact with Blakley, however. Norman told them that he could not physically move Blakley because of his shoulder injury.

Jensen and Doubleday met with Siebers while Norman waited. Because Thorne's version corroborated Blakley's, they decided not to expand the investigation and involve other employees in a sensitive matter involving a salaried employee. The men concluded that Norman had grabbed Blakley by the arms or shoulders in anger and physically moved him from one place to another.

Blue Heron has a written policy prohibiting workplace violence which requires company management to investigate and take prompt action, up to and including immediate termination.

Jensen, Doubleday, and Siebers considered various forms of discipline for Norman: (1) a suspension; (2) a referral to the Employee Assistance Program with a suspension; (3) a Last Chance Agreement; and (4) termination. Siebers considered whether Blakley or the situation provoked Norman and concluded otherwise. Management concluded that Norman's behavior could not be tolerated.

Jensen and Doubleday returned to the room where Norman was waiting. Jensen terminated Norman and gave him a termination letter and final paycheck. Norman was 58 years old. Norman told them that he had a verifiable injury[2] and had a doctor's appointment scheduled.

After Norman was terminated, Jensen met with Norman's subordinates, Lige McKinney, Mike Portus, and Ron McClintock, and told them that they were not qualified to be Norman's replacement. McKinney states that Jensen said they wanted to hire a person with a chemistry background and some paper maker experience. McKinney agrees that none of Norman's subordinates, himself included, had the skills to perform Norman's job. McClintock, on the other hand, thought the disqualification was unusual because all three men had performed the job on a temporary basis to fill in for Norman. According to Jensen, two of the three Paper Machine Superintendents since 1989 have had technical degrees in either pulp and paper or engineering. Norman, who Jensen believes has excellent technical skills, was the only exception. None of Norman's subordinates hold one of the technical degrees and, according to Jensen and Siebers, none have the experience, education, or skills the mill was seeking to replace Norman.

Steve Carlstrom, age 42, was hired from outside to replace Norman.

---

[2] Norman says that he made this statement either when he was handed his termination letter and final check, or earlier. The timing of the statement is not important because before the Blakley incident, Norman told Jensen about his shoulder injury.

On June 14, 2005, Norman called Doubleday to request an 801 workers' compensation claim form. Norman completed the form and returned it to Blue Heron shortly thereafter for filing with SAIF Corporation.

Between January 1, 2002 and July 30, 2004, Blue Heron employees filed about 150 new workers' compensations claims. Three of these people filing new claims were later terminated.

**LEGAL STANDARDS**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

**DISCUSSION**

I.   Age Discrimination

Norman alleges claims of age discrimination under the Age Discrimination in Employment Act ("ADEA") and ORS Chapter 659A. Blue Heron moves for summary judgment against both claims.

The Age Discrimination in Employment Act ("ADEA") makes it unlawful for an employer to hire or discharge any individual or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of the

individual's age. 29 U.S.C. § 623(a)(1). Protection under the ADEA extends to all individuals who are at least 40 years old. 29 U.S.C. § 631(a). The order and allocation of proof in cases under Title VII of the Civil Rights Act applies to age discrimination claims under the ADEA. Wallis v. J.R. Simplot Co., 26 F.3d 885, 888 (9th Cir. 1994).

To establish a prima facie case of age discrimination, a plaintiff must produce enough evidence at summary judgment for the trier of fact to infer the fact at issue. The elements are that plaintiff: (1) was a member of the protected class (age 40-70); (2) was performing the job in a satisfactory manner; (3) was discharged; and (4) replaced by a substantially younger employee with equal or inferior qualifications. Nidds v. Schindler Elevator Corporation, 113 F.3d 912, 917 (9th Cir. 1996), cert. denied, 522 U.S. 950 (1997). The fourth element has been applied with flexibility. Id. (court erred by concluding that to establish a prima facie case, plaintiff was required to show that he was at least as qualified as his replacement).

For purposes of the summary judgment motion, Blue Heron does not contest that Norman can establish his prima facie case.

Once plaintiff has established a prima facie case, the burden of production shifts to the defendant to rebut the presumption of discrimination by articulating some permissible reason for the adverse action. Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994). "Once the defendant fulfills this burden of production by offering a legitimate, nondiscriminatory reason for its employment decision, the . . . presumption of unlawful discrimination 'simply drops out of the picture.'" Id. (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510 (1993)).

Blue Heron states that it terminated Norman because it concluded that he had inappropriately shoved Blakley.

Then the burden shifts to the plaintiff to show that the defendant's reason is a pretext for another motive which is discriminatory. Id.

Under federal standards, to avoid summary judgment, the plaintiff

> must produce enough evidence to allow a reasonable factfinder to conclude *either*: (a) that the alleged reason for [the plaintiff's] discharge was false, *or* (b) that the true reason for his discharge was a discriminatory one.[3]

Nidds v. Schindler Elevator Corporation, 113 F.3d 912, 918 (9th Cir. 1996) (emphasis in the original), cert. denied, 522 U.S. 950 (1997). If the plaintiff offers direct evidence of discriminatory motive, a triable issue on the actual motivation is created "even if the evidence is not substantial." Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998). The plaintiff may also offer circumstantial evidence that tends to show that the proffered motive is a pretext because it is inconsistent or unbelievable. In this case, the evidence of pretext must be specific and substantial to create a triable issue on whether the employer intended to discriminate. Id. at 1222.

The standard for establishing a prima facie case of discrimination under Oregon law is identical to that used in federal law. Henderson v. Jantzen, Inc., 79 Or. App. 654, 657, 719 P.2d 1322 (expressly adopting formulation in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981) as test for

---

[3] At trial, the plaintiff must prove <u>both</u> of these elements. If the plaintiff persuades the jury that the defendant's reason is false, however, the jury could infer the ultimate fact of intentional discrimination, without additional proof, based on this disbelief and the prima facie case. Id. at 918 n.2 (citing St. Mary's, 509 U.S. at 511, 515). See also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148, 120 S. Ct. 2097, 2108 (2000) ("Thus, a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."). In a summary judgment motion, the nonmoving party, here the plaintiff, gets the benefit of all possible inferences.

ORS Ch. 659 actions), rev. denied, 302 Or. 35 (1986). Oregon courts rejected the burden-shifting mechanism applicable to federal claims. Hardie v. Legacy Health System, 167 Or. App. 425, 434-38, 6 P.3d 531 (2000). The Ninth Circuit held, however, that in a diversity action under Oregon's disability discrimination statute, it would apply the *McDonnell Douglas* burden-shifting analysis rather than Oregon's rule because the burden-shifting analysis was federal procedural law. Snead v. Metropolitan Property Casualty Insurance Co., 237 F.3d 1080, 1090-93 (9th Cir.), cert. denied, 534 U.S. 888 (2001).

Norman denies that he had any physical contact with Blakley and argues that Blue Heron had good reason to know that none occurred. Norman notes that Jensen declined to interview Clancy, a witness to the incident who told Jensen that there was no physical contact. Norman also relies on his subordinates' testimony that he does not lose his temper and is not violent or threatening.

Alternatively, Norman argues that the conduct did not justify termination considering Norman's excellent employment record, even assuming the truth of Blakley's description. Norman contends that the normal noise on the mill floor, as well as the stress when a machine is down, makes yelling and touching required to communicate and causes tempers to flare.

Norman points to several facts to argue that Blue Heron management discriminated generally against older workers, specifically in the key positions of paper machine superintendent and the three day machine supervisors: (1) Blue Heron's statement to the three shift machine supervisors, two of which were 62 and 58 years old, that they would not be considered to replace Norman; (2) Blue Heron's failure to advertise the position after Norman's termination; (3) Siebers' offer of Norman's position to two men aged 40 and 42; (4) hiring a 42-year-old from

outside, without advertising the position to replace McClintock, age 40, in his machine supervisor position and (5) the difference between Norman's immediate termination and Griesenuer's progressive discipline for workplace violence. Norman also points to several conversations with Siebers and Jensen during which they told him that they wanted to fill day shift supervisor vacancies with younger engineers. Norman attributes the motives of mill manager Siebers, age 55, and operations manager Jensen, age 56, to the fact that they would not want Norman, age 58, or other older workers in the key positions from which new mill managers and operations managers are typically selected.

      Blue Heron contends that Norman cannot raise a factual issue that the stated reason for his termination is pretextual. According to Blue Heron, any conversation that Jensen had with Norman about his retirement plans does not show that Blue Heron did not want Norman to remain employed as long as he wished and is insufficient to demonstrate pretext. Blue Heron notes that the succession planning was done by the previous owner, Smurfit, and took place more than four years prior to Norman's termination. Similarly, the workers Norman contends were replaced by younger workers all took transfers under Smurfit's ownership. Blue Heron argues that none of these workers experienced any change in pay or benefits at the time of their transfers and are all still employed by Blue Heron.

      I first note that it is not the court's role to determine whether Norman inappropriately shoved Blakley or whether his termination was a good or bad personnel decision. "In judging whether . . . proffered justifications were false, it is not important whether they were *objectively* false (e.g. whether [plaintiff] *actually* lied). Rather, courts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even

baseless." Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1063 (9th Cir. 2002) (emphasis in the original). The question to be resolved in this action is whether Blue Heron truly relied on its stated reason for terminating Norman or if it instead terminated him based on a discriminatory motive.

Both parties submitted a lot of evidence concerning Norman's interactions with other employees, both favorable and unfavorable in the eyes of the employees. Likewise, there is a lot of evidence concerning the replacement of several older workers with younger people. I primarily base my conclusion on Norman's testimony that Siebers and Jensen, on several specific occasions when Norman was trying to hire for an open position, told Norman that they wished to hire younger engineers. This evidence is adequate to raise a factual issue that Blue Heron's stated reason for Norman's termination was a pretext. Thus, I deny the summary judgment motion on the federal and state age discrimination claims.

II.     Workers' Compensation Discrimination

Norman alleges that Blue Heron terminated him in retaliation for his intent to file a workers' compensation claim, in violation of ORS 659A.040.

Blue Heron moves to dismiss this claim. It first notes that Norman did not file his claim until after he had been terminated. Thus, Norman would have to base the retaliatory termination on his reference to his shoulder injury prior to his termination. Blue Heron contends that Norman's vague references to his injury, made several months prior to his termination and accompanied by Norman's statement that he had absolutely no intention of filing a claim, do not raise a factual issue that Blue Heron's stated reason for his termination is pretextual. Blue Heron also argues that Norman, as a manager, was well aware of how to file workers' compensation

claims and that nothing prevented him from filing the claim prior to his termination. Blue Heron notes that in the three-year period from 2002 through July 30, 2004, its employees filed approximately 150 new workers' compensation claims and that only three of those employees were terminated.

Norman denies that he had a conversation with Jensen about filing an accident report on his shoulder injury. He points to a conversation during which either Jensen or Doubleday discouraged him from filing a workers' compensation claim because medical insurance claims were better for the company. Norman notes that he told Jensen in late May that his shoulder was worse and he was going to see a doctor. He contends that Blue Heron failed to follow the law and immediately report his injury to its insurer. Norman relies on the evidence and arguments made to support his age discrimination claim to show that the alleged reason for his termination was a pretext.

A prima facie case of retaliation under Oregon's injured workers' law, a plaintiff must establish: (1) plaintiff invoked the workers' compensation system; (2) plaintiff was discriminated against in the tenure, terms or conditions of employment; and (3) the employer discriminated against plaintiff because he invoked the workers' compensation system. Hardie v. Legacy Health System, 167 Or. App. 425, 433, 6 P.3d 531 (2000). Under Snead, the federal burden-shifting standard applies.

I will assume that Norman has established a prima facie case of workers' compensation discrimination based on his statement to Jensen that he had hurt his shoulder on the No. 3 paper machine. Under Snead, I turn to whether the stated reason for the termination was pretext.

The fact that Jensen did not fill out an accident report for Norman is not indicative of a discriminatory motive. Norman was well aware of how to complete the form and had helped his employees do so in the past. Jensen, as Operations Manager, would not typically spend his time completing this type of paperwork. The conversation Norman had with either Jensen or Doubleday about claims costing the same regardless of whether they are filed under the medical or workers' compensation system also is not indicative of a discriminatory motive. Norman's interpretation that the remark was intended to discourage him from filing a workers' compensation claim, because the rates are raised based on the number of claims, goes far beyond what was said. Although it is true that Norman's termination came a month or so after he told Jensen about his shoulder injury, the termination was only three days after the Blakley incident. Combined with the fact that Blue Heron has only terminated three of the 150 employees who filed new workers' compensation claims between January 1, 2002 and July 30, 2004, Norman has not raised a factual issue that his termination was a pretext for workers' compensation discrimination. I grant summary judgment and dismiss this claim.

## CONCLUSION

Defendant's Motion to Strike (#72) is denied in part on the merits and in part as moot. Defendant's Motion for Summary Judgment (#40) is granted in part. Norman's workers' compensation claim is dismissed with prejudice. The federal and state age discrimination claims remain for trial.

IT IS SO ORDERED.

Dated this ___27th___ day of October, 2005.

                                                      /s/ Garr M. King
                                                      Garr M. King
                                                      United States District Judge